## UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF MICHIGAN- SOUTHERN DIVISION

SUE FRITZ

an individual

Plaintiff

HON:

FILE NO:

**COMPLAINT**

**FILED - KZ**

December 14. 2007 1:49 PM

RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY___rtw_____/_____

v

CHARTER TOWNSHIP OF COMSTOCK

a public body

**1:07-cv-1254**

**Robert Holmes Bell**
**Chief U.S. District Judge**

AND

TIM HUDSON

individually and in his official
capacity as the supervisor for the
Charter Township of Comstock

Defendants

---

William F. Piper (P38636)
William F. Piper, PLC
Attorney for Plaintiff
8175 Creekside Drive, Suite 270
Portage, MI 49024
(269) 321-5008
(269) 321-5009 facsimile

---

The plaintiff Sue Fritz, by and through her attorney William F. Piper, PLC, and Ford,

Kriekard, Soltis & Wise; for her Complaint, states as follows:

### JURISDICTIONAL ALLEGATIONS

1.  The plaintiff, Sue Fritz, doing business as the Fritz Agency, resided in the County of

    Kalamazoo at all times relevant to this Complaint, and she still resides there.

2.  The defendant Charter Township of Comstock (hereafter Comstock) is a public body located

-1-

in the County of Kalamazoo, State of Michigan that employed the defendant Tim Hudson

as its supervisor, at all times relevant to this Complaint.

3.      The claims in this action arise in part under 42 USC § 1983.

4.      Jurisdiction is based on 28 USC § 1331 and 28 USC § 1337.

5.      Certain claims in this action arise out of this court's supplemental jurisdiction to hear and

        decide claims arising out of the same transactions and occurrences as the federal claim.

## COMMON ALLEGATIONS

6.      The plaintiff restates and realleges as though fully set forth herein paragraphs 1-5 of this

        Complaint.

7.      Ms. Fritz entered into a contract with Farm Bureau Insurance Company to be an independent

        agent for it on or about February 3, 2005.

8.      On or about May 2005 Ms. Fritz identified a single family home located at 3930 North 26th

        Street as one that would be a good location for her and her independent insurance agency,

        and she purchased the property, contingent on Comstock approving a home office for her

        agency.

9.      Ms. Fritz applied for a Special Exception use permit, and changes were requested in the text

        language of it.

10.     During the next several months Ms. Fritz attended Comstock Planning Commission and

        Board of Trustees meetings related to the issues of the text amendment and the approval for

        her home office.

11.Ms. Fritz noticed that many of the meetings appeared to violate the Open Meetings Act,  that

minutes of the meetings were not accurate, and that procedures were not uniformly followed,

-2-

depending on the identity of the persons affected.

12. At one of the meetings, wherein Ms. Fritz's office was not on the agenda, Tim Hudson said, with obvious irritation, when Ms. Fritz was the only person in the audience, "people don't come to the meetings unless they are on the agenda."

13. Later at a work session for the Comstock budget Tim Hudson told Ms. Fritz "we are elected to do our job, and we don't need you to make sure we do it," in an attempt to intimidate Ms. Fritz from attending the meetings.

14. Ms. Frtiz's home office was finally approved in October 2005.

15. In late 2005 and early 2006 citizens stated false information about Ms. Fritz and her home office to others, statements that apparently originated in part from Comstock officials.

16. Subsequently, Ms. Fritz realized that Comstock had zoning restrictions and ordinances that restricted the way her agency could conduct business, including that the business was restricted as follows:

    A.    From having a sign of more than 1' to 2' describing the business;

    B.    From having employees working on the premises that did not live on the premises;

    C.    From having less than 1/3 of the square feet devoted to the home business;

17. Ms. Fritz then exercised her right as a citizen to request a zoning variance on the subject property.

18. The Zoning Board of Appeals and the Board of Trustees conducted an investigation and decided not to issue a variance.

19. On or about February 29, 2006 the Zoning Board of Appeals or the Board of Trustees then issued a signage violation on the subject property.

-3-

20.    Ms. Fritz immediately requested a sign variance and paid costs; the sign remained until the hearing; the variance was denied; Ms. Fritz then promptly and timely complied with all applicable ordinances.

21.    At an April 25, 2006 Zoning Board of Appeals meeting, in which Ms. Fritz's request for a variance was denied, in retaliation against her for her speech and conduct at comstock meetings and her petitioning Comstock for a redress of grievances, several false statements were made about Ms. Fritz and her business to and by citizens and officials of Comstock.

22.    On July 17, 2006 Ms. Fritz sent an e-mail and fax to Tim Hudson complaining about Comstock officials falsely accusing her of zoning and other violations.

23.    On July 21, 2006 Ms. Fritz contacted Tim Hudson by e-mail to complain about a neighbor harassing her and making derogatory comments about her, including in signs that had adversely affected her business.

24.    On July 28, 2006 Tim Hudson spoke with Ms. Fritz's Farm Bureau supervisor by phone.

25.    In that phone conversation Mr. Hudson complained to Ms. Fritz's supervisor that Ms. Fritz had said things in planning commission meetings that she should not say, that there was a petition in her neighborhood against her, and that she was very antagonistic against Comstock, all of which were misleading or false or both.

26.    Mr. Hudson also complained that Ms. Fritz had written a letter to the editor of a local newspaper regarding a business called Midlink in which he stated that Ms. Fritz "bashed" Comstock, which was misleading or false or both.

27.    Mr. Hudson also stated that if Ms. Fritz would tone down her speech and remove her sign, her problems might go away.

-4-

28.     Mr. Hudson also stated to Ms. Fritz's supervisor that Ms. Fritz was in violation of an
        ordinance prohibiting "solicitation of business clients", a statement that was false.

29.     Mr. Hudson's statements to Ms. Fritz's supervisor were designed to both pressure Ms. Fritz
        to discontinue attending Comstock meetings and express opinions on Comstock issues
        publicly and privately and discontinue petitioning Comstock for a redress of grievances, as
        well as pressure Farm Bureau to move out of Comstock or terminate its relationship with Ms.
        Fritz or both.

30.     Ms. Fritz's supervisor then met with her and directed and warned her to take her sign down,
        stop attending Comstock meetings, and stop speaking at Comstock meetings, and he also
        threatened her with adverse job consequences if she did not comply with his directions and
        warnings.

31.     On or about early September 2006 Comstock Planning Commission member Steve Gazdeg
        expressed his displeasure to Ms. Fritz's supervisor that Ms. Fritz had brought her attorney
        to a Planning Commission Meeting.

32.     On November 15, 2006 Mr. Hudson again spoke with Ms. Fritz's supervisor about her and
        about many of the things referenced above, and he emphasized again that there would be
        adverse consequences to her and Farm Bureau from a public relations perspective if she
        continued with her public and private comments about and related to Comstock and her
        petitioning for a redress of grievances with Comstock about her work situation, which she
        had continued by herself and through her attorney Margaret Smith.

33.     In January 2007 Ms. Fritz spoke up in a Comstock public meeting about the ineffectiveness
        of Comstock administrators, and a newspaper prominently reported this criticism.

34.    In a telephone call with Ms. Fritz's supervisor on March 1, 2007, Mr. Hudson complained
       angrily about Ms. Fritz's attendance at Comstock meetings, her public comments and
       advocacy of her business, her petitioning of Comstock for a redress of grievances related to
       it, and her alleged, but not actual, video camera at Comstock meetings.

35.    Mr. Hudson warned Ms. Fritz's supervisor that Farm Bureau's presence in Comstock was
       in jeopardy because of Ms. Fritz's speech and conduct referenced above and that Comstock
       was allegedly in an uproar about it.

36.    Mr. Hudson also suggested to Ms. Fritz's supervisor that Ms. Fritz's speech and conduct
       referenced above was damaging to Farm Bureau's business and business prospects.

37.    Ms. Hudson made the statements to Ms. Fritz's supervisor set forth above intending to
       interfere with Ms. Fritz's business relationship with Farm Bureau.

38.    An official of Comstock also told Ms. Fritz's supervisor that she was a menace to Comstock

39.    On March 22, 2007 Ms. Fritz's supervisor terminated Ms. Fritz's employment or contractual
       relationship or both with Farm Bureau, and he explained to her that it was because of
       "controversial community relations with your neighbors and with the local governmental
       unit."

40.    On April 2, 2007 Ellen Eggleston, who is Mr. Hudson's sister, punched and broke a video
       camera that was being used to tape record a Comstock meeting, in the course of heated
       communication with Ms. Fritz after a Comstock meeting, conduct that reflected the
       disposition of Comstock, including Mr. Hudson, towards Ms. Fritz, and conduct that
       Comstock did not attempt to prevent.

41.    Ms. Eggleston angrily told Ms. Fritz, "I have more rights than you because I have lived here
       for over 40 years."

-6-

42.    Ms. Eggleston's actions, and, especially,  the actions of Comstock and Mr. Hudson set forth
       above, were extremely threatening to Ms. Fritz, and they caused her severe emotional
       distress.

43.    As a result of the unlawful actions described above, the Plaintiff suffered and will continue
       to suffer a loss of income and benefits, a loss of goodwill, damage to her personal and
       business reputation, a loss of business opportunities, emotional distress, anger, a loss of
       enjoyment of life, and other consequential and incidental damages.

## COUNT I-
## FIRST AMENDMENT RETALIATION

44.    The plaintiff restates and realleges as though fully set forth herein paragraphs 1-43 of this
       Complaint.

45.    The plaintiff had a clearly established right under the First Amendment of the Constitution
       of the United States not to be retaliated against for attending public meetings and speaking
       out to the press at public meetings of a government body about matters of public interest, and
       for petitioning a unit of government for a redress of grievances, including speaking out about
       matters that were matters of public concern and at issue in the meetings of a public body, and
       about the performance of the administrators and employees of the public body.

46.    The defendants retaliated against Ms. Fritz by deliberately threatening her for exercising and
       continuing to exercise her First Amendment rights and by deliberately speaking to her
       employer in an unlawful, improper, and unprivileged way that caused it to condition Ms.
       Fritz's employment or contractual relationship with it on Ms. Fritz's willingness not to speak
       at Comstock public meetings or speak out about the performance of Comstock
       administrators, or petition Comstok for a redress of grievances; and by denying her variances

and other accommodations that other, more favored business people and citizens received.

47.   The defendants could not reasonably have believed that their conduct was reasonable or within the constitutional limitations on the exercise of their authority.

48.   The defendants, throughout the time period at issue in this Complaint and thereafter, had a policy, pattern, or practice of retaliating against individuals who spoke out, including at public meetings, about Mr. Hudson or other administrators or employees of Comstock who supported him; or who appeared at public meetings; or who expressed any criticism of Mr. Hudson, or any combination of the above.

49.   The defendants' unlawful retaliatory actions against Ms. Fritz described above were part of this unconstitutional policy, pattern, and practice.

50.   Alternatively, or cumulatively, the unlawful retaliatory actions by the defendants set forth above were carried out by the person or entity with final decision making authority for the defendant.

51.   The defendants' violations of Ms. Fritz's First Amendment rights described above are actionable under 42 USC § 1983.

52.   As a result of the defendants' violations set forth above, the plaintiff Ms. Fritz suffered the damages set forth above.

**WHEREFORE**, the plaintiff requests a judgment against the defendants that would include compensation for her past and future economic and non damages, punitive damages against Mr. Hudson, costs, interest, attorneys fees under 42 USC § 1988, and any other legal relief this Court deems fair and just; and any applicable equitable relief, including an injunction against any prior restraints upon protected First Amendment speech.

-8-

## COUNT II-
## TORTIOUS INTERFERENCE WITH CONTRACT,
## TORTIOUS INTERFERENCE WITH BUSINESS
## RELATIONSHIP OR EXPECTANCY, AND DEFAMATION

53.    The plaintiff restates and realleges as though fully set forth herein paragraphs 1-52 of this
       Complaint.

54.    The defendants, as described extensively above, intentionally, unlawfully, and improperly
       interfered with Ms. Fritz's contract with Farm Bureau or business expectancy with it or both
       by making improper and defamatory statements about her to Farm Bureau and by improperly
       and unlawfully telling Farm Bureau and suggesting to it that if it continued a relationship
       with Ms. Fritz or did not prevent her from exercising her First Amendment rights or both,
       it would be subject to public obloquy or would jeopardize its ability to conduct business
       effectively in Comstock or both.

55.    The defendants intentional interference with Ms. Fritz's contract or business expectancy  in
       fact interfered with that contract or business expectancy, because, as a direct result of the
       defendants' interference described above, Farm Bureau terminated Ms. Fritz's contract or
       business expectancy.

56.    As a result of the defendants' unlawful and improper conduct, the plaintiff Ms. Fritz has
       suffered the damages set forth above.

       **WHEREFORE**, the plaintiff requests a judgment against the defendants that would include
compensation for her past and future economic and non damages, punitive damages against Mr.
Hudson, costs, interest, attorneys fees, and any other legal relief this Court deems fair and just; and
any applicable equitable relief, including an injunction against any prior restraints upon protected
First Amendment speech.

DATED: December 6, 2007

**RESPONSE:** WILLIAM F. PIPER, PLC

By _____

William F. Piper (P38636)
Attorney for Plaintiff